# Middleton *v.* Wilson & Lozano.

## *Action of Detinue for Goods.*

1. *Sale; erroneous charge.*—Where a sale of goods by an agent is consummated, except in regard to the time of credit to be allowed, that being left to the principal, and a certain "dating" being requested by the purchaser, which is refused by the principal, and in the ensuing correspondence the principal writes that he will deliver the goods upon guaranty of immediate payment, refuses offered guaranty of future payment and subsequently offers to accept the same, but the guarantor then refuses to continue his offer, it is error to charge that the purchaser is entitled to recover the goods (which are in possession of third party, who is the defendant and is acting for original owner) if the principal wrote that he would deliver the goods if guaranty was obtained, and the purchaser obtained the same, as the charge misstates the evidence in ignoring the qualifications of the guaranty.

2. *Appeal; error without injury.*—Where a party has had the benefit of his entire defense under the general issue, the rulings on demurrer to special pleas are immaterial.

Appeal from Mobile City Court.

Tried before Hon. O. J. Semmes.

Overall & Bestor, for appellant.

Gregory L. & H. T. Smith, *contra.*

STONE, C. J.—Tefft, Weller & Co. were wholesale merchants doing business in New York, and Sweeny was a salesman of theirs, having more than usual powers to negotiate sales, either as to a class of persons, or within a certain locality. The record does not inform us as to the precise nature or extent of his powers. We infer that he was specially authorized to negotiate sales to customers, whose patronage of the house was procured through his instrumentality, and that Wilson & Lozano, retail merchants of Mobile, Alabama, were of that class. It is not shown whether Sweeny was what is known as a travelling salesman, or drummer; but it is fairly inferrable that Wilson & Lozano

[Middleton v. Wilson & Lozano.]

had previously made purchases from the house, and that those purchases had been negotiated with Sweeny. It is also inferrable, if not shown, that Sweeny had power, or was in the habit of sending out drummers of his own appointment, to negotiate sales of the merchandise of Tefft, Weller & Co. The testimony tends to prove, and there is no conflict, that the customary terms of wholesaling in New York were, on general merchandise, four months credit, and, on special lines of goods, two months credit. There was also testimony tending to show that special rates, called "dating," were sometimes granted, giving longer credit; but this was matter for special agreement, and without such agreement, the general rates stated above were observed.

We do not know that we correctly understand the word "dating," as disclosed in the testimony. The record does not explain it. We infer that its office and meaning are, to adhere nominally to the terms of credit—two and four months—noted above, while in reality a longer credit is granted, by fixing a future, agreed date, from which the period of credit, two and four months, shall begin to run. There is testimony tending to show that Wentz or Allen, members of the firm of Tefft, Weller & Co., had control of the matter of giving extended credit to customers—of granting or withholding what are called "datings."

The present suit was brought for the recovery of certain packages of merchandise, which had been the property of Tefft, Weller & Co. The goods were in the possession of Middleton, who claimed to hold them on the title of Tefft, Weller & Co. Wilson & Lozano claimed that the title to the goods was in them, by virtue of a contract of purchase they alleged they had made. So the most important inquiry is, whether such contract of sale and purchase had been agreed upon, so as to pass title. The material parts of the negotiation were and are in writing, shown by letters and telegrams produced in evidence; and the question most controverted is, whether the two contracting parties ever reached an agreement on the terms of credit.

Wilson & Lozano wrote Sweeny, under date January 7, 1887, requesting samples to be sent them. Sweeny replied that he would send an agent, and did send Green, with samples. Wilson & Lozano and Green, about the middle of January, 1887, agreed on a bill of goods to be shipped, agreed on the prices of the several kinds of goods, aggregating something over three thousand dollars; but did not agree on

the terms of credit. Wilson & Lozano asked for a dating of May 1, which, as we understand it, would make the bill for special lines of goods fall due July 1, and the bill for the general merchandise, September 1. Wilson & Lozano did not order the goods unconditionally, but on condition that these terms of credit would be granted them. Green did not agree to these terms, disclaimed all authority to grant such terms, and it was entered on the head of the order that these terms of credit were dependent on, and subject to Sweeny's decision and approval. As we understand the record, no contract of sale had been concluded at this stage of the negotiation. There was an offer to purchase on condition that certain datings would be granted, but no agreement to grant these datings. The two minds had not then come together.

Sweeny wrote Wilson & Lozano January 25, complaining of prices Green had agreed on, but saying nothing of terms of credit. Part of the goods, however, were shipped, but Sweeny insisted on raising some of the prices.

Sweeny again wrote Wilson & Lozano January 28, as follows: "I [have] just received a letter from Green in regard to dating. Now, we are willing to give you the best dating any one gets here, but we certainly can not entertain any such date as May. It is absurd to talk of such a thing. Mr. Allen, our man, is away to-day; our financial man. I would not have shipped your goods until every thing was settled, but goods were shipped, except things we wrote you about, before I got the letter. As soon as we hear from you, the balance of the order." (Seems to be something omitted.)

To this Wilson & Lozano replied January 31, as follows: "Your two letters of 28th, and 29th to hand, and contents noted. While we do not care to take advantage of any one, we do not care to let any body get the advantage of us. So, this time, we were very careful in explaining matters to Mr. Green. If he failed to report to you the matter of dating, (which was very important that he should), it is not our lookout, but yours and his. We are getting May 1st from everybody else we bought goods of, and we do not ask you for nothing [anything] extra. . . . . . . In *regard to the other goods* not shipped, if you choose to ship them at prices bought, you can. Otherwise, do not."

Following the foregoing, and commencing February 3, is a telegraphic correspondence between Tefft, Weller & Co., and Wilson & Lozano, in relation to the financial condition

of the latter firm. There is also a letter on same subject from T. W. & Co. to W. & L., bearing date February 3. To this telegram there was a telegraphic reply from Pollock & Co., another mercantile firm of Mobile, dated February 4, and saying of W. & L: "We have always found them prompt in their payments, and sell them what goods they want."

On same date Wilson & Lozano sent telegram to Tefft, Weller & Co., containing the following: " We understand time of order to be as per duplicate left with us. Shall we receive them on these terms, or hold them subject to your order?"

Tefft, Weller & Co., on February 5, wrote Wilson & Lozano acknowledging receipt of above telegram, from Pollock & Co., and also telegram from Wilson & Lozano of same date. They ask further explanation of an alleged shrinkage of W. & L.'s assets, as shown by their several reports, and continue as follows: "We should desire to have you favor us with a detailed explanation of the loss or difference; pending which we are frank to say we can accept the terms of your telegram, and shall hold the goods until we hear from you. Or, presuming that you have need of the goods, we shall be pleased to have them promptly delivered to you, if you can arrange with your friends to guarantee the sale, for which we are willing to pay the usual guarantee per-centage, that is to say, in addition to our regular discount of two per cent. off, on domestic goods, and six per cent. off regular goods, we will allow you two per cent. extra, to-wit: four per cent. off on domestic, and eight per cent off on regular goods, for cash remittance New York exchange."

On February 9, Wilson & Lozano wrote or telegraphed to Tefft, Weller & Co., further explaining financial condition, and added: "If the statement is satisfactory, you can ship the goods with the exception," &c.

On February 11, Wilson & Lozano telegraphed Tefft, Weller & Co. in these words: "As yet we have received no reply to last telegram. We wish to know your decision in the matter. Telegraph us at once without delay. Answer."

On February 12, the following telegrams were sent to Tefft, Weller & Co. First, from Wilson & Lozano: "Telegraph to First National Bank the amount of your bill, and authorize agent here to collect same and release goods, so we can get them Monday morning." Second, from First National Bank: "We guarantee the payment when due of Wilson & Lozano's last purchase to the extent of three thou-

sand dollars, as per terms of their duplicate, if released to-day. If satisfactory, telegraph agent here to release goods at once. Answer." Tefft, Weller & Co. replied to First National Bank, same date, as follows: "We consider your guaranty abundantly good, but can not deliver goods on terms they claim. Will allow four per cent. on cash goods and eight per cent. on regular goods, for cash remittance; or, upon message from you that cash has been sent, will release goods. Answer if accepted."

In the afternoon of the same day, 12, the First National Bank repeated its telegram of the morning.

On February 13, Tefft, Weller & Co. dispatched Wilson & Lozano in these words: "Our credit man has been absent. We should prefer to have you return the goods."

On February 14, Middleton, in whose possession the goods had been detained, dispatched Tefft, Weller & Co. as follows: "Wilson & Lozano offer settlement as per your telegram. Will I deliver goods." To which Tefft, Weller & Co. answered, same day: "Upon receipt of telegram from First National Bank that settlement remittance is made, we will deliver goods."

Same day, February 14, Tefft, Weller & Co. dispatched First National Bank: "By request of Wilson & Lozano, cash bills amount to twenty-four hundred and ninety-eight dollars ($2498.55) fifty-five cents, regular goods five hundred and eighty-four dollars ninety-one cents ($584.91.)"

On February 15, Tefft. Weller & Co. dispatched First National Bank: "Letter of guaranty in Wilson & Lozano matter received. Can deliver goods to-day on it. Answer, if you wish delivery made to-day."

To this the First National Bank replied, same date: "Would prefer not taking further action in the matter. Our guaranty was for one day, and expired."

The foregoing expresses the substance of all that bears on the question of contract *vel non*.

It should be stated that Middleton had no interest in the goods. He was the ship's resident agent in Mobile, and as such detained the goods, pursuant to an order from Tefft, Weller & Co., received before the goods arrived in port.

For reasons which we shall state further on, we found it necessary to arrange and classify the testimony in the present record, before proceeding to consider the legal questions raised. We confess we did not and could not understand the facts, or apply legal principles to them, until with great

[Middleton v. Wilson & Lozano.]

labor, we effected the classification.   There are but two ma-
terial questions of fact in this case that are not fully shown,
and without conflict, by the letters and telegrams.   The first
of the questions was and is, the condition on which Wilson
& Lozano placed their order with Green, namely; that it was
on condition that they could get a dating as of May 1, and
that condition was, by the agreement, left to the decision of
Sweeny.   This is testified to, in terms, by Lozano, one of
the plaintiffs, and is not only not denied, but is fully con-
firmed by the correspondence,   There was, on this question,
not a semblance of conflict in the testimony, and the corres-
pondence treats this as a postulate, or conceded fact.

The second question was, the stoppage of the goods in
the hands of Middleton, the ship's agent, because the May
dating had not been conceded, and that, on this account, the
terms of credit had not been agreed on.   In every instance
where this subject is in any way referred to in the corres-
pondence, it is treated precisely on this basis.   Wilson &
Lozano all the while claimed that they should have the
goods on the May dating, and they did not pretend that they
had placed the order on any other terms.   The guaranty
offered by the bank was expressly placed on this condition,
and it was refused expressly on this account.   On these
questions as the testimony appears in the record before us,
the trial court might have charged directly without hypothe-
sis, as upon written, or documentary evidence.—1 Brick.
Dig. 336, §7; *Tyree v. Lyon*, 67 Ala. 1; 3 Brick. Dig. 109,
§ 44.   On all the other questions, bearing on the right of
plaintiffs to recover, the testimony was written, and it was
the duty of the court to interpret it.—1 Brick. Dig. 336, § 9;
3 Brick. Dig. 107, § 4.

As we have said, we did not and could not understand the
facts of this case until we classified them, nor, could we feel
safe in attempting to declare the legal principles involved,
without understanding the facts.

The negotiations between Green and Wilson & Lozano,
did not amount to a finished contract of sale.   One term—
the dating—was not agreed on.   That was to be determined
by Sweeny.   Till he determined to grant the term of credit,
which was made a condition in Wilson & Lozano's offer to
purchase, there was and could be no contract.   Their minds
had not come together on the one important element—the
length of credit.   Neither Sweeney nor Tefft, Weller & Co.
ever agreed to the dating proposed by Wilson & Lozano, but

[Middleton v. Wilson & Lozano ]

repudiated it as soon as it was brought to their notice. Wilson & Lozano's telegram of February 4, proves that they recognized the question of dating as still open and undetermined.

It is contended for appellees that in subsequent negotiations, Tefft, Weller & Co. waived their objection to the enlargement of the terms of credit, and consented to the sale, with a dating of May 1. All the evidence bearing on this question is furnished in the correspondence copied above. It may be summarized as follows:

On February 12 the First National Bank telegraphed to Tefft, Weller & Co. that it would guarantee Wilson & Lozano's purchase to the extent of $3,000, when due. "When due," was intended and understood to mean, that their guaranty was of the purchase, with the "dating" of May 1. To this Tefft, Weller & Co. promptly replied that they could not deliver the goods on the terms claimed. In the same telegram they submitted a proposition to sell them the goods for cash, at an extra discount of 2 per cent. To this telegram we are not informed that any reply was made. On February 14, Tefft, Weller & Co. telegraphed to Middleton substantially what they had previously telegraphed to the First National Bank.

The last communication from Tefft, Weller & Co. was their telegram to the bank of February 15. As we understand that telegram, they therein proposed to waive their objection to Green's conditional agreement, to consummate the sale with a dating of May 1, if the bank would guarantee, as proposed on February 12. This is the first time they proposed to yield the matter of credit, and deliver the goods on the May dating; but the offer is put on the condition that the bank will guarantee payment. This the bank promptly declined to do, saying: "Our guaranty was for one day, and expired."

We can not agree that there is any proof of waiver of the objection to the May dating, save that found in Tefft, Weller & Co.'s telegram of February 15, and that was put on the express condition of the bank's guaranty, which was refused. The plaintiffs failed to prove title in themselves.

At the request of the plaintiffs, the court gave the following charge: "If the jury believe from the evidence that on the 4th day of February, 1887, Wilson & Lozano telegraphed Tefft, Weller & Co. that they understood terms of order to be as per duplicate with them, and asked if they should re-

[Middleton v. Wilson & Lozano.]

ceive the goods on the terms or hold them subject to Tefft, Weller & Co., and that Tefft, Weller & Co. wrote in reply that they would accept the terms of their telegram and hold the goods until they heard from Wilson & Lozano; or presuming that they had need of the goods they (Tefft, Weller & Co.) would be pleased to have them promptly delivered, if they (Wilson & Lozano) could arrange with friends to guarantee the sale, and that after that and before Tefft, Weller & Co. wrote any further letter or telegram to Wilson & Lozano, they (Wilson & Lozano) got the First National Bank to guarantee their bill to Tefft, Weller & Co., then Wilson & Lozano were entitled to have the goods delivered to them at that time." Defendant excepted to the giving of this charge.

This charge is clearly erroneous, in leaving out a very important, qualifying part of the letter of Tefft, Weller & Co. of February 5. They did not make the naked offer to deliver the goods, "if they, Wilson & Lozano, could arrange with friends to guarantee the sale." Their exact language was as follows: "Presuming that you have need of the goods, we shall be pleased to have them promptly delivered to you, if you can arrange with your friends to guarantee the sale, for which we are willing to pay the usual guaranty percentage; that is to say, in addition to our regular discount of two per cent. off on domestic goods, and six per cent. off on regular goods, we will allow two per cent. extra, to-wit, four per cent. off on domestic, and eight per cent. off on regular goods, for cash remittance, New York exchange." Now, while the first clause, if it stood alone, would indicate that a guaranty of payment was all that Tefft, Weller & Co. sought, taking the whole sentence together it shows what they meant by the word guaranty. It was a guaranty that the purchase price should be presently remitted to them in New York exchange. Awkwardly expressed, we admit, but still so connected in its different members that we can give but one interpretation to the sentence. The second branch commencing with the words, "that is to say," is but the writer's definition of what he obscurely expressed in the first. The offer was to allow two per cent. for the guaranty. They had all the while repudiated the May dating, and it is very improbable that they intended, not only to surrender that objection, but to submit to an additional loss of two per cent. to obtain guaranteed performance of a contract they had never ceased to repudiate. And Tefft, Weller & Co.'s prompt refusal of the bank's offer to guarantee payment, "when due,

. . . . as per terms of their duplicate," is persuasive to show the sense in which they intended their offer to be understood. A charge which misstates the evidence, or ignores material, qualifying testimony, is ground of reversal.—1 Brick. Dig. 244, § 135; *Adams v. Thornton*, 78 Ala. 489.

If plaintiffs are entitled to recover, there is no testimony authorizing a recovery of any goods which had not been shipped and received by Middleton. Any goods withheld in New York must be excluded from the estimate, and no recovery had for them. This, for the obvious reason, if no other, that, never having had possession, it is impossible that Middleton can have detained them.—3 Brick. Dig. 307, §§ 15, 16.

The value should be fixed on the goods as they were—in packages. In other words, the wholesale price in Mobile, less the freight. And while the jury may find the highest market value, as a means of coercing delivery, they can not go behind the date of the detention—the time when the right of action accrued. The jury *may*, not *must*, fix the highest value, between the accrual of the right to sue and the trial. 3 Brick. Dig. 309, § 45.

We consider it unnecessary to pass on the rulings on demurrer. The special pleas simply raise the question of plaintiffs' ownership of the property sued for, and, consequently, of their right to maintain the action. Middleton held possession under Tefft, Weller & Co., and could and did defend on the strength of their claim. Having rightfully had the benefit of his and their entire defense under the general issue, the special pleas and the rulings on them were immaterial.—*Mitcham v. Moore*, 73 Ala. 542.

There are many exceptions to the rulings on the admissibility of testimony, not necessary to be particularized. We are not aware that any errors were committed in this regard. Witnesses can not, as a rule, testify to matters *as facts*, whose very nature shows they *could not know them as facts*. Motives, intentions, want of knowledge or notice, are personal in their nature, about which one person can not speak for another.

We consider it unnecessary to notice any other question raised by the record.

We regret that we feel called on to notice the form in which the record comes before us in this case. It will have been observed that most of the important testimony is documentary, and constitutes quite a lengthy correspondence. If chronology, or narrative connection of subjects had been re-

[Middleton v. Wilson & Lozano.]

spected, we would have encountered no difficulty in mastering the facts. So far from that being so, we find the communications, some thirty in number, scattered pell-mell through sixty-six pages of folio manuscript. In addition to this, the entire testimony is set out, when, as to a large part of it, its tendencies were alone necessary to a proper understanding of the questions sought to be presented. This has devolved great and unnecessary labor, which should not be required of us. And this record by no means stands alone, in the objectionable features pointed out. We have heretofore had occasion to make the same complaint we are now urging.—*Harris v. Powers*, 57 Ala. 139; 3 Brick. Dig. 78, § 5.

In framing bills of exceptions, if there are rulings on the admissibility of evidence which it is desired to have reviewed, in many if not most cases the question and answer sufficiently explain themselves, and raise the question, without further explanation. If, however, explanation is necessary to show the pertinency or bearing of the question or answer objected to, a brief statement should be embodied, showing the connection and pertinency. We propose to say nothing of the principles which govern, when charges are given. To attempt even a brief exposition of the rules relating to that question, would swell this opinion beyond reasonable bounds. A single principle applicable to the rule as to charges refused should be here stated, because of its frequent presentation. To raise such question, it must be affirmatively shown that there was testimony tending to prove the facts, on which the charge is based. All the record need show, however, is, that there was testimony tending to prove the facts hypothesized, or implied in the charge. It is never necessary to set out the testimony *in extenso*, except in cases where it is our duty to review the finding on the facts. And it is always improper to incumber the record with either testimony or rulings, to which no exception is reserved, unless such testimony is necessary to a proper understanding of some question reserved.

There can be no excuse for going beyond the rules stated above in the draught of a bill of exceptions; and when so drawn, fairly presenting the questions reserved, the trial judge can not and will not refuse to sign the bill. Should he do so, "he is guilty of a high misdemeanor in office," and on proper proceedings, the bill can be established in this court.—Code of 1886, § 2762.

The large increase of costs of appeal caused by the undue

[Wedgworth v. Wedgworth.]

dimensions of bills of exceptions, is an oppression to the party who fails in this court. In this case, the injury falls on the appellees, who, at least *prima facie*, are not responsible for it. The clerk had no discretion, but must make a full and correct transcript of the record. He must not suffer in the loss of his costs. On an appeal from a law court, we have no power to apportion the costs. If the appellees have any remedy, it must be against the appellants, for the needless expense unnecessarily imposed upon them. We simply throw out the suggestion, without intending to decide the legal question involved. We trust, however, that trial judges will see to it, that bills of exceptions be not incumbered with needless matter, or with unnecessary details, which only tend to confuse.

Reversed and remanded.